UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| WILLIAM KELLER and RONNIE GULLION, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:07-cv-129-SEB-WGH |
| | ) | |
| INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION and THE STATE OF INDIANA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants, | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, PLAINTIFFS' MOTION TO AMEND/SUBSTITUTE RESPONSE, DEFENDANTS' MOTION TO STRIKE AFFIDAVIT OF RANDY WILKERSON, AND PLAINTIFF'S MOTION TO FILE SURREPLY**

## I.    Introduction

This is a gender-based discrimination and retaliation case brought by Plaintiffs against their employer, pursuant to Title VII of 42 USC 2000c.  Currently before the Court is Defendants' Motion for Summary Judgment filed on September 9, 2008, (Docket Nos. 36-37) to which Plaintiffs filed their joint Amended Response on November 25,

2008.[1]  (Docket No.43).  Defendants filed a Reply brief on December 4, 2008, (Docket No. 44).

II.    **Factual and Procedural Background**

   **A. Plaintiffs' Employment**

   Madison State Hospital ("Madison") is a mental health facility administered and operated by the State of Indiana.  (Deposition of William Keller ("Keller Dep.") at 106). The facility is divided into separate units or wards for housing various types of patients; the units are designated by names, such as Recovery Road, Harmony Lane, and Gold 1-4. *Id*. at 13-14.

   Plaintiffs William Keller ("Keller") and Ronnie Gullion ("Gullion"), both males, are former employees of Madison. (Complaint ¶¶ 8, 17).  Keller began his employment with the State of Indiana in 1988 as a "DST"[2] at Muscatatuck State Hospital.  (Keller Dep. at 9).  In approximately 1989, Keller began work at Madison as a Psychiatric Attendant ("PA") 5.  *Id*. at 9-10.  In approximately 1990, Keller became a Qualified Medical Administrator 4 (Keller Dep. at 10) and, in approximately 2003, Keller was

_____

[1]Plaintiffs initially filed their Response on November 19, 2008, (Docket No 41), before noting that certain errors were contained therein.  Plaintiffs requested leave to amend the Response.  (Docket No. 43).  The Court hereby **GRANTS** Plaintiffs' Motion to Amend/Substitute Plaintiffs' Response to Motion for Summary Judgment.

[2]No explanation for the designation "DST" has been provided to the Court.

elevated to the position of PA 4, which position he continues to hold at the present time. *Id*. at 10-11.  Keller is 6'2" tall and, at all relevant times, weighed approximately 310 pounds.  (Keller Dep. at 118).

In 2006, Keller's immediate supervisor was, John Cole ("Cole"), an RN Supervisor 6.  (Keller Dep. at 12, 23).  In May or June of 2007, Lora Forneau ("Forneau") became his supervisor, which position she continues to hold.  *Id*. at 12-13, 21.  During the time that Cole was Keller's supervisor, Cole's supervisor was Brenda Chambers ("Chambers"), Assistant Director of Nursing, who in turn reported to Judy Barbeau ("Barbeau"), the  Director of Nursing.  (Keller Dep. at 15).

As a PA 4, Keller was responsible for making sure patients were safe, dressed, fed and properly cared for.  (Keller Dep. at 16).  On April 24, 2007, Keller engaged in an altercation with a male patient and, as a result, was removed from direct patient care; following an investigation into the incident, Keller was removed permanently from that patient's unit because of the conflict.  (Keller Dep. at 47-48, 50).

Gullion's employment with the State of Indiana began in 1989 and continued intermittently thereafter.  He has been a Licensed Practical Nurse employed at Madison since approximately September or October of 2004.  (Deposition of Ronnie Gullion ("Gullion Dep.") at 15).  At all times relevant to this action, Gullion weighed 275 pounds and is 6'4" tall.  (Gullion Dep. at 119).  In 2006, depending on work schedules for a given

day, Gullion's immediate supervisor was either Cole or another male, Tom Fetterhoff,

who is a Registered Nurse. *Id.* at 31. Fetterhoff, like Cole, reports directly to Chambers

who in turn reports to Barbeau. (Gullion Dep. at 32). As an LPN, Gullion's

responsibilities include "passing" (distributing) medications to patients. (Gullion Dep. at

17-18).

A portion of both Keller and Gullion's duties at Madison required them to assist

with unruly patients; this process at Madison was referred to as "Bridge Building."

(Keller Dep. at 17; Gullion Dep. at 38). Bridge Building included use of several physical

techniques, including "stapling," the "come-along" technique, and "hugs."[3]  (Keller Dep.

at 17). Madison employees received training on the techniques for performing Bridge

Building. (Keller Dep. at 17-18; Gullion Dep. at 38). In addition to Bridge Building,

Madison employed a procedure for dealing with emergencies referred to as a Code Green.

(Keller Dep. at 34-35; Keller Dep. at Ex. 4; Gullion Dep. at 48). The Code Green policy

was first implemented on August 14, 2006, and provided as follows:

3. CODE GREEN

In the event of a psychiatric emergency, if additional assistance is required
beyond staff on unit to safely handle a patient situation, the unit nurse or

---

[3]According to Keller's deposition testimony, these are techniques for dealing with
otherwise out of control patients, consisting of physical holds placed by staff on a patient to
curtail movement. "There's the stapling where you use your hand across their–keep them from
being able to swing. There's the come-along technique. Then from there you can go to the part
where they call hugs and put them on the floor, and then the turn. It's a way to deal with out-of-
control patients." (Keller Dep. p 17).

designee will call the operator to utilize the intercom system.  The operator will announce: "CODE GREEN - building number, floor A or B and unit name - CODE GREEN".  This will be utilized only when absolutely necessary and will alert all disciplines and all levels of direct care staff. This staff will include:  RN's, LPN's, Nursing Supervisors, Psychiatric Attendants, Psychiatric Attendant Supervisors, Rehab Staff, Social Service Staff, Psychology Staff and Security Staff (ONE person per unit) to respond to the emergency.  This will exclude those actively involved in 1:1, 2:1 monitors or those involved in a medical procedure.

During nighttime hours, 2100 until 0600, if CODE GREEN is required, contact Attendant Supervisor and they will notify units of emergency to avoid disturbing patients.

(Keller Dep. at Ex. 4).  Prior to implementation of the Code Green policy, the policy for responding to emergencies entailed an attendant supervisor calling the ward to request that a specific person respond.  (Keller Dep. at 32-33).  The Code Green call system was implemented following installation of an intercom system and required that one person-per-ward respond to any signaled emergency.  *Id*. at 35-37.

According to Keller, following the implementation of the Code Green response system, each of the Plaintiffs would, from time to time, receive calls and each would respond as required. (Keller Dep. at 36).  Based on subsequent revisions to the policy adopted on January 26, 2007, anyone responding to a Code Green signal was also required to complete a Code Green Report.  (Keller Dep. at 39-40; Gullion Dep. at 56). Gullion acknowledges that he had responded to relatively few Code Green emergencies since the new policy was adopted and, in each instance when he and Keller did respond, they filled out the proper forms.  (Keller Dep. at 39-46; Gullion Dep. at 53-56).

- 5 -

Madison also established a policy requiring completion of a Code Green Response Log as a means of tracking each Code Green that occurred on the various units.  The Log identified the primary respondent for each emergency call.  Debora Woodfill ("Woodfill"), who served as the Performance Improvement Director of Madison, oversaw the preparation and maintenance of the Response Logs, including preparation of summaries as necessary.  She explained that these documents were intended to be records that were prepared simultaneously with the events recorded therein.  (Woodfill Aff., Exh. 25).

According to a summary of all the 2007 Code Greens prepared and submitted by Defendants, a total of 277 Code Greens occurred during that single year, of which Keller responded on six calls and was the primary respondent on only one of those six.  Of that same 277 Code Greens in 2007, Gullion responded to only one but was not the primary respondent on that occasion.  Combined, Plaintiffs responded to a total of seven Code Greens and had primary responsibility for only one of them. (Woodfill Aff.).

The Code Green policy prohibits removals of employees from one-on-one, or two-on-one, monitoring relationships with patients.  Plaintiffs allege that they nonetheless were pulled away from duty when they were monitoring patients in this fashion when they were needed to respond to Code Greens.  (Affidavit of Randy Wilkerson ("Wilkerson Aff.") ¶ 5).  According to Plaintiffs, supervisors have in the past specifically requested that men respond when a Code Green is initiated, presumably based on their

superior physical strength.  *Id*. ¶ 11.  Plaintiffs also state that they typically were allowed to remain in a centrally located area during their shifts from which they could observe all the patients on their ward and play cards during the down times while patients slept, a practice that has recently been prohibited.  (Wilkerson Aff. ¶ 16).  Plaintiffs' co-worker, Randy Wilkerson ("Wilkerson"), testified that female supervisors and their female co-workers were permitted to continue to play cards during the downtimes on their shifts even after the policy change. *Id.*  Wilkerson also maintains that Plaintiffs were prohibited from wearing shorts while on duty, but female employees were routinely permitted to wear shorts.  (Wilkerson Aff. ¶ 17).  Finally, Plaintiffs allegedly were permitted to bring in electric appliances, such as coffee makers, to their workplaces, but, after lodging "their complaint about being discriminated against," these devices were no longer permitted.  *Id*. ¶ 19.

Gullion asserts that the change in the dress code which prohibited their wearing of shorts to work was imposed in retaliation for his discrimination complaint. (Gullion Answers to Interrogatories, No. 3). Gullion also claims that he was further retaliated against when he was prohibited from playing cards on the job.  In addition, he asserts that, also in retaliation, he was denied a lateral transfer which position was given instead to a woman who was a new hire.  (Gullion Answers to Interrogatories, No. 10).

Keller cites as forms of retaliation which he was caused to suffer as follows: 1) he was restricted from playing cards while on duty; 2) he was no longer permitted to bring electrical kitchen-like appliances to work; 3) he was removed from his work unit during an investigation of alleged patient abuse and required to work in the kitchen; and 4) his supervisor was directed to reduce Keller's job performance evaluation to "non-satisfactory" following the alleged patient abuse incident. (Keller Answers to Interrogatories, No. 10).  Keller also maintains that the prohibition against wearing shorts in the workplace was imposed in retaliation for his having filed a complaint (Keller Dep. at  99).

Defendants respond that no written or unwritten policy or procedure has ever been adopted at Madison requiring or preferring men over women as persons responsible for responding to Code Green situations. (Woodfill Aff. ¶ 9, 10; Gullion Dep. at 55). Director of Nursing Judy Barbeau oversees the scheduling and assignments of employees on the various work shifts, including Keller and Gullion, and testified that assignments at Madison are and always have been made based on the needs of the institution, the experience of the staff involved and various other non-gender related reasons. (Affidavit of Judy Barbeau (Barbeau Aff. ¶ 8)).  Further, neither Keller nor Gullion was assigned to any specific unit or required to rotate between or among units based on his gender.

(Barbeau Aff. ¶ 11).[4]  Neither Keller nor Gullion was ever assigned to any specific unit or made to rotate between units because of complaints either had made based on gender discrimination. (Barbeau Aff. ¶ 12).

In response to Plaintiffs' complaint that they were not permitted to wear shorts during work times, Defendants note that a dress code was implemented at Madison in order to project a professional appearance among all the staff, (Woodfill Aff. ¶¶ 22, 23), and only one portion of the policy prohibits the wearing of shorts by employees.  *Id.* ¶ 24. Defendants claim that the code applies to all staff regardless of gender and was neither adopted nor enforced based on the gender of individual staff members.  Defendants further allege that the prohibition on wearing shorts was not imposed in response to discrimination complaints by Keller or Gullion.  *Id.* ¶ 26.

### B. Plaintiffs' EEOC Charges

Keller filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC charge") on February 22, 2007, alleging gender-based discrimination.  (Plaintiffs' Amended Response to Defendants' Motion for Summary Judgment at 3).  Gullion filed an EEOC charge on February 21, 2007, also alleging gender-based discrimination.  *Id.*  A right to sue letter was issued on June 25, 2007.

---

[4]In fact, Gullion admitted that there is a female nurse on his shift who also gets assigned to other units on a temporary basis.  (Gullion Dep. at 78-80).

### C. Plaintiffs' Lawsuit

Plaintiffs filed their Complaint in this litigation on September 21, 2007, alleging that each of them was a victim of gender-based discrimination.  Specifically, they allege that they were both treated differently based on their gender (male) and were subjected to a "hostile work environment."  Further, they allege that they were retaliated against after engaging in protected activity, to wit, complaining of discrimination.  Finally, Plaintiffs allege that, pursuant to Indiana statutes, Defendants' actions amounted to the intentional infliction of emotional distress against them.

### D. Defendants' Motion for Summary Judgment

Defendants contend in their Motion for Summary Judgment that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law on each of Plaintiffs' claims.  Specifically, Defendants maintain that Plaintiffs have failed to prove a *prima facie* case of gender discrimination or retaliation.  In the alternative, Defendants assert that, even if Plaintiffs succeeded in demonstrating a *prima facie* case, there are legitimate nondiscriminatory reasons for Defendants' actions.  Defendants also argue that certain of Plaintiffs' claims are beyond the scope of their EEOC charges.  Finally, Defendants assert that Plaintiffs have not pled facts sufficient to support recovery for the intentional infliction of emotional distress.

### III.    Legal Standard

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).  The motion should be granted so long as no rational fact finder could return a verdict in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc., 4*77 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the question essentially for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  When ruling on the motion, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor. *Id.* at 255.  If the nonmoving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *see also Silk v. City of Chicago,* 194 F.3d 788, 798 (7th Cir. 1999).  Lastly, the moving party need not positively disprove the non-movant's case; rather, it may prevail by establishing the lack of evidentiary support for that case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The summary judgment standard is applied "rigorously in employment discrimination cases, because intent and credibility are such critical issues" and direct

evidence is rarely available.  *Wohl v. Spectrum Mfg., Inc.,* 94 F.3d 353, 354 (7th

Cir.1996); *Senner v. Northcentral Technical Coll.,* 113 F.3d 750, 757 (7th Cir.1997).  To

that end, we carefully review affidavits and depositions for circumstantial evidence

which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has

also made clear that employment discrimination cases are not governed by a separate set

of rules and thus remain amenable to disposition by summary judgment so long as there is

no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections,*

*Inc.,* 109 F.3d 406, 410 (7th Cir.1997).


## IV.    Analysis

As previously noted, Plaintiffs' Complaint alleges that they were victims of gender

discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e et seq.   Plaintiffs also allege they were subjected to the intentional

infliction of emotional distress.  We begin by addressing various alleged procedural

shortcomings in Plaintiffs' submissions.


### A.    Because Plaintiffs have failed to comply with Local Rule 56.1, Defendants' Motion to Strike Affidavit of Randy Wilkerson is <u>granted</u>, and Plaintiffs' Motion to File Surreply is <u>denied</u>.

As an initial matter, the court must address Plaintiffs' various procedural misstep,

to wit, their failure to comply with Local Rule 56.1, their reliance on the affidavit of

Randy Wilkerson, and their attempt to file a Surreply to remedy certain defects in their

Amended Response to Defendants' Motion for Summary Judgement.  Local Rule 56.1(b)

requires that the non-movant:

> [F]ile a supporting brief and any evidence not already in the record upon which the party relies.  The brief shall include a section labeled "Statement of Material Facts in Dispute" which responds to the movant's asserted material facts by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment.  These facts shall be supported by appropriate citations to discovery responses, depositions, affidavits, and other admissible evidence either already in the record or contained in an appendix to the brief.

In addition, Sections (d) and (e) of Local Rule 56.1 provide:

> (d) **Surreply.** If, in reply, the moving party relies upon evidence not previously cited or objects to the admissibility of the non-moving party's evidence, the non-moving party may file a surreply brief limited to such new evidence and objections, no later than seven days after service of the reply brief.

> (e) **Effect of Factual Assertions.** For purposes of deciding the motion for summary judgment, the Court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts: are specifically controverted in the opposing party's "Statement of Material Facts in Dispute" by admissible evidence; are shown not to be supported by admissible evidence; or, alone, or in conjunction with other admissible evidence, allow reasonable inferences to be drawn in the opposing party's favor which preclude summary judgment. The Court will also assume for purposes of deciding the motion that any facts asserted by the opposing party are true to the extent they are supported by admissible evidence. The parties may stipulate to facts in the summary judgment process, and may state that their stipulations are entered only for the purpose of the motion for summary judgment and are not intended to be otherwise binding. The court has no independent duty to search and consider any part of the record not specifically cited in the manner described in sections (a) and (b) above.

S.D. Ind. R. 56.1.  And, Federal Rule of Civil Procedure 56(e) outlines the requirements

- 13 -

of a nonmoving party regarding the submission of affidavits:

> **e) Affidavits; Further Testimony.**
> **(1)** ***In General.*** A supporting or opposing affidavit must be made on
> personal knowledge, set out facts that would be admissible in evidence, and
> show that the affiant is competent to testify on the matters stated. If a paper
> or part of a paper is referred to in an affidavit, a sworn or certified copy
> must be attached to or served with the affidavit. The court may permit an
> affidavit to be supplemented or opposed by depositions, answers to
> interrogatories, or additional affidavits.
> **(2)** ***Opposing Party's Obligation to Respond.*** When a motion for summary
> judgment is properly made and supported, an opposing party may not rely
> merely on allegations or denials in its own pleading; rather, its response
> must--by affidavits or as otherwise provided in this rule--set out specific
> facts showing a genuine issue for trial. If the opposing party does not so
> respond, summary judgment should, if appropriate, be entered against that
> party.

FED.R.CIV.P. 56 (e).

In their Amended Response to Defendants' Motion for Summary Judgment,

Plaintiffs have failed to include a "Statement of Material Facts in Dispute."   Instead, the

sole piece of admissible evidence that Plaintiffs have submitted in support of their

Amended Response is the Affidavit of Randy Wilkerson.[5]  Unfortunately for Plaintiffs,

the Wilkerson Affidavit contains hearsay evidence as well as many assertions that do not

constitute "facts that would be admissible in evidence."   Hence, to the extent that portions

of the Wilkerson Affidavit are inadmissible, Defendants Motion to Strike Affidavit of

---

[5]Attached to the Wilkerson Affidavit is a list of the heights and weights of various female
employees at Madison.  However, the affidavit does not comply with Rule 56(e) of the Federal
Rules of Civil Procedure because the data contained therein are not authenticated as based either
on an official document or record or on Wilkerson's own personal knowledge.

Randy Wilkerson is GRANTED, and those portions are stricken.  Those inadmissible portions of the Affidavit are:  Paragraph 4 (irrelevant); the first sentence of Paragraph 5 and  Paragraph 8 (hearsay) and Paragraphs 9, 13, 14, 14, 18 and 22 (not supported by Affiant's direct knowledge).

In addition, because Plaintiffs have filed a Surreply brief in an attempt to remedy their failure to file a "Statement of Material Facts in Dispute," we must deny Plaintiffs' Motion to File Surreply.  The Local Rules clearly limit a surreply to responses to <u>new</u> evidence or arguments made for the first time in a prior brief.  Plaintiffs' intended Surreply thus does not comort with Local Rule 56.1 and the Motion to File Surreply is accordingly DENIED.

### B. Plaintiffs' "Disparate Treatment" Claims

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.  Plaintiffs may thus demonstrate that they were discriminated against via either the direct or indirect method of proof.  *Butts v. Aurora Health Care,* 387 F.3d 921, 924 (7th Cir. 2004).  Because  Plaintiffs have

not adduced direct evidence of gender discrimination,[6] the Court examines the claim using the burden-shifting method set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under the *McDonnell-Douglas* framework, an employee must first establish a *prima facie* case of discrimination.  *Pafford v. Herman,* 148 F.3d 658, 665 (7th Cir. 1998).  Once an employee has carried the burden of demonstrating a *prima facie* case, there is a presumption of discrimination, and the burden shifts to the employer who must articulate a legitimate, nondiscriminatory reason for the action.  *Id.*  If the employer provides such a reason, the burden then shifts back to the employee to prove that the employer's stated reason is a mere pretext. *Vakharia v. Swedish Covenant Hosp.,* 190 F.3d 799, 806-07 (7th Cir. 1999).  "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, [and] so long as [the employer] honestly believed those reasons, pretext has not been shown."  *Farrell v. Butler University,* 421 F.3d 609, 613 (7th Cir. 2005).  In fact, the Seventh Circuit has determined that pretext means a phony reason for the employer's actions.  *See Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 983 (7th Cir. 1999).

---

[6]The only attempt by Plaintiffs in their Amended Response to Defendants' Motion for Summary Judgment to supply direct evidence of gender discrimination was through their citation to the Affidavit of Randy Wilkerson, which stated that on one occasion a female supervisor, Leslie Crask ("Crask"), ordered Plaintiff to responded to a Code Green, exclaiming, "I don't care if it's discrimination, I want a man."  However, no evidence establishes that Crask acted as a supervisor for either Plaintiff in imposing this requirement.  Hence, her statements are immaterial to Plaintiffs' claims and further clearly constitute inadmissable hearsay; that portion of the Wilkerson Affidavit has therefore, been stricken.

In order for Plaintiffs to present a *prima facie* case of gender discrimination under Title VII, they must show that they: (1) are members of a protected class, (2) were performing their jobs to their employer's legitimate expectations, (3) suffered adverse employment action(s), and (4) were treated less favorably than at least one similarly-situated female colleague. *Farrell,* 421 F.3d at 613. Our analysis reveals that Plaintiffs have failed to carry their burden of demonstrating a *prima facie* case.

There is no argument that Plaintiffs have demonstrated that, as males, they were members of a protected class and that there is no argument that they were not performing to their employer's legitimate expectations. Thus, they have satisfied two prongs of their *prima facie* case. However, Plaintiffs' claims languish on both the third and forth prongs.

First, Plaintiffs have failed to demonstrate that they have suffered any adverse employment action. In the context of a Title VII gender discrimination case, an "adverse employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000). An employee must show that the complained-of employment actions fall into one of three categories: 1) they affect the employee's current wealth, such as in terms of compensation, fringe benefits, and financial terms of employment as well as

- 17 -

termination; 2) they affect the employee's career prospects in terms of possible advancement; or 3) they involve changes in the employees work conditions, including actions which subject him to humiliating, degrading, unsafe, unhealthy, or otherwise significant negative *alteration* in the work place environment.  *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007).

Here, many of the alleged wrongs Plaintiffs have cited as disadvantages that they were forced to endure simply do not constitute adverse employment actions for purposes of their gender discrimination claims.  Not being permitted to bring in electronic equipment, play cards, or wear shorts at work, for example, clearly do not rise to the level of adverse employment actions.  The Seventh Circuit has made clear that not everything that makes an employee unhappy is an actionable adverse employment action, and Title VII does not prohibit minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee does not like.  *Nichols v. Southern Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007).

Additionally, Plaintiffs have failed to demonstrate through admissible evidence  that men were required to respond to dangerous situations at Madison when women were spared such responsibilities, and that this was true both before or after implementation of the Code Green policy.  Perhaps if Plaintiffs had been able to demonstrate that women were never called to respond to dangerous emergency situations and men were always called to

respond to them and that such a differentiation in duties adversely effected the men in some fashion (i.e., more injuries, more sick leave required, etc.), then they might have succeeded in demonstrating an adverse employment action based on gender.  However, there is no such evidence, in large part because Plaintiffs completely failed to submit the necessary factual support required by Local Rule 56.1.  Mustering such evidentiary support is Plaintiffs' obligation; "the court has no independent duty to search and consider any part of the record not specifically cited" by Plaintiffs.  S.D. Ind. R. 56.1.

Even if they had succeeded in demonstrating that they suffered some adverse employment action, Plaintiffs have entirely failed to identify any similarly situated female colleagues who were treated more favorably.  "A similarly situated employee is one who is 'comparable to plaintiff in *all material respects.*'"  *Perez v. Illinois*, 488 F.3d 773, 773 (7th Cir. 2007)(quoting *Crawford v. v. Ind. Harbor Belt RR. Co.*, 461 F.3d 844 846 (7th Cir. 2006)(emphasis in original)).  In a situation where Plaintiffs claim that they were treated more harshly than other employees because of a prohibited motive such as gender, Plaintiffs are required to demonstrate that they were similarly situated with respect to performance, qualifications, and conduct.  *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000).  "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or

mitigating circumstances as would distinguish their conduct or their employer's treatment of them." *Id.*[7]

Plaintiffs' failure to comply with Local Rule 56.1 again undermines their claims. Keller is employed at Madison as a PA 4 and Gullion is employed as an LPN. In order to demonstrate a *prima facie* case, Gullion must come forward with the name of at least one female LPN who was subject to the same decisionmaker as he was and was treated more favorably. Similarly, Keller must identify at least one female PA 4 who was subject to the same decisionmaker and was treated more favorably. Because we hold that the only adverse employment action suffered by these two Plaintiffs that would possibly entitle them to relief was the requirement that they respond to emergency situations such as Code Greens when women employees were not so required, Plaintiffs must include as part of their proof that at least one female employee whose term of employment was comparable to theirs in all material respects was exempt from having to respond to such emergency situations. Plaintiffs' Amended Response, however, does not include the names of *any* female employee about whom the court could conclude that she was similarly situated to Plaintiffs and was not required to respond to emergency situations at

---

[7]Although the Seventh Circuit has used language that suggests that an individual must have the same supervisor to be similarly situated, it is clear that what is really necessary for employees to be similarly situated is that they be "subject to the same decisionmaker." *See Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826 (7th Cir. 2008).

Madison.  Because the Amended Response to Defendants' Motion for Summary Judgment is devoid of *any* evidence of similarly situated female employees treated more favorably than Plaintiffs, Plaintiffs attempt to demonstrate a *prima facie* case of gender discrimination clearly falls short of the mark.

Plaintiffs' failure to demonstrate that they suffered any adverse employment action or that similarly situated female employees were treated more favorably means that Defendants' Motion for Summary Judgment seeking dismissal of Plaintiffs' gender discrimination claims must be GRANTED and Plaintiffs' disparate treatment claims must be DISMISSED.

### B. Plaintiffs' Hostile Work Environment Claims

Plaintiffs' Complaint also alleges a hostile work environment claim of gender discrimination under Title VII.  In order to prevail on their claims of sexual harassment based on a hostile work environment, Plaintiffs must demonstrate that: 1) they were subjected to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; 2) the conduct they were subjected to was either severe or pervasive enough to create a hostile work environment; 3) the conduct was directed at them because of their sex; and 4) there is a basis for employer liability. *Quantock v. Shared Marketing Serv., Inc.*, 312 F.3d 899, 903 (7th Cir. 2002). Further, in order to demonstrate the existence of a hostile work environment,

the conditions must be so severe or pervasive that they altered the conditions of Plaintiffs' employment and created an abusive working environment. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002). Additionally, the environment must be both subjectively and objectively offensive. *Id.* at 463. However, Plaintiffs may prevail by showing one instance of offensive conduct that is sufficiently severe or by demonstrating the existence of "conduct that is not particularly severe but that is an incessant part of the workplace environment." *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). It is, therefore, important to examine the totality of the circumstances including the frequency and severity of the conduct, whether it is physically threatening, humiliating, or offensive, and whether it unreasonably interfered with Plaintiffs' work performance. *Murray v. Chicago Transit Authority*, 252 F.3d 880, 889 (7th Cir. 2001).

In the case at bar, Plaintiffs have pled a claim of hostile work environment but do not specifically allege that they were the recipients of unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. Plaintiffs do allege that they were "harassed" by co-workers because they were not allowed to wear shorts during work hours. This, however, is not the type of harassment prohibited by Title VII. In order to demonstrate a hostile work environment, Plaintiffs must establish that they were victimized by a particularly egregious and pervasive type of conduct by Defendants, which Plaintiffs have

entirely failed to show.  Therefore, Defendants' Motion for Summary Judgment must be GRANTED on this claim as well, and Plaintiffs' hostile work environment claims shall also be DISMISSED.

### C. Retaliation

Finally, Plaintiffs allege they were retaliated against by their employer based on their having complained of their gender-base discrimination.  Under Title VII, an employer is prohibited from retaliating against an employee who engages in protected activity.  *See* 42 U.S.C. § 2000e-3(a).  As the Supreme Court has recently held, the provisions of Title VII prohibiting retaliation are not limited to "ultimate employment decisions."  *Burlington Northern & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405 165 L.Ed.2d 345 (2006).  An employer's actions are prohibited under Title VII so long as they produce an "injury or harm" that a reasonable employee would have found to have been materially adverse; that is, the actions "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Id*. at 67-68.

As with the other discrimination claims, an employee may prove retaliation via the direct or indirect method of proof.  In order to demonstrate retaliation through the direct method, an employee must present direct evidence that: 1) he engaged in statutorily protected activity; 2) he suffered an adverse employment action; and 3) there is a causal connection between the two.  *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 531 (7th Cir.

2003).  And, in order to establish a "causal connection," an employee must show that the employer had actual knowledge of the protected activity; it is not sufficient that an employer could have or should have known that the employee had engaged in protected activity.  *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004).  Under the indirect method of proof, an employee must demonstrate that: 1) he engaged in statutorily protected activity; 2) he was performing his job to his employer's legitimate expectations; 3) he suffered an adverse employment action; and 4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  *Id*. at 714.  Once an employee has established a *prima facie* case of retaliation under the indirect method, the burden then shifts to the employer to provide a legitimate, non-discriminatory reason for its actions.  If the employer can make such a showing, the burden then shifts back to the employer to demonstrate that the employers' reason is pretextual.  *Armhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860-61 (7th Cir. 2008).

Once again, Plaintiffs' failure to adhere to the requirements of Local Rule 56.1 dooms their claim–this time, their retaliation claim.  In fact, Plaintiffs have altogether failed to respond to Defendants' Motion for Summary Judgment in defense of their retaliation claim, particularly regarding whether they are relying upon either the direct or indirect method of proof.  In addition, they cite to no admissible evidence--deposition testimony, affidavit, or otherwise–to support their entitlement to relief on this basis.

Plaintiffs do allege that both of them engaged in protected activity in the form of

their filing of the EEOC charges.[8]  Additionally, Plaintiffs have generally alleged that they  were victims of adverse employment actions.  While we recognize that the range of conduct prohibited under the anti-retaliation provisions of Title VII is broader than that prohibited by Title VII's anti-discrimination provisions (*Henry v. Milwaukee County*, 539 F.3d 573, 586 (7th Cir. 2008)), Plaintiffs' failure to demonstrate that they suffered from any adverse employment actions, while it does not automatically defeat their retaliation claims, nonetheless erodes the significance of their retaliation claim because every conceivable "harm" that an employee sustains does not support an actionable retaliation claim.  The court must distinguish significant from trivial harms, and our analysis in that regard is informed by Seventh Circuit precedent which includes a holding that "being told not to wear sweaters or eat in front of juveniles, unspecified 'intimidation' and door slamming by the head of shift, missing or marked up time-cards, occasional early morning phone calls, and not being assigned to work together on the same shift or in easier pods are the type of petty slights and minor annoyances that generally" do not suffice to dissuade a reasonable employee from engaging in protected activity and, thus, do not constitute adverse employment action.  *Id*. at 587.  In examining Plaintiffs' claims, we are of the view that restrictions against card-playing by employees while they are on duty, rules prohibiting  shorts as acceptable workplace attire, and limitations on use of personal electronic devices in the workplace are the types of trivial slights that the

---

[8]Plaintiffs, however, have alleged that their EEOC charges were filed, but no copy was made available to the court.

Seventh Circuit in *Henry* found to be insufficient as actions that would dissuade a

reasonable employee from filing an EEOC charge.[9]

Putting aside for the moment that responding to Code Greens is a routine

responsibility for employees at Madison, assuming that such duty presents a heightened

risk of injury to those called upon to respond, then being singled out as an employee who

must routinely respond to Code Greens when other Madison employees are not might

possibly be a situation that would dissuade a reasonable employee from engaging in

protected activity.  Thus, if Plaintiffs had presented evidence to show that, after they filed

their EEOC charges, they were routinely singled out as the only employees at Madison

_____

[9]Plaintiffs asserted two additional forms of retaliation in their Answers to Interrogatories
which have gone unaddressed in their Amended Response to Defendants' Motion for Summary
Judgment.  Gullion asserted, in Answer to Interrogatory No. 10, that he was denied placement on
the unit named Journey Way.  However, he has not pled sufficient facts for the court to
determine if he claims that this denial amounted to retaliation.  Specifically, Gullion does not
allege facts relating to the person(s) responsible for this decision, whether that person knew that
he had filed an EEOC charge, when the decision took place in relation to the filing of his EEOC
charge, what the qualifications were for that specific position, or who was actually hired instead
of him.  Without this information, the court cannot determine whether this action amounted
either to a harm or an adverse employment action.  Keller's assertion, in Answer to Interrogatory
No. 10, is more specific.  He asserts that he was retaliated against by being treated improperly
during the investigation of a claim that he physically abused a patient.  However, Keller has not
addressed how or why such action constituted retaliation in Plaintiffs' Amended Response to
Defendants' Motion for Summary Judgment. Thus, Keller is deemed to have waived this issue.
Additionally, he has not indicated who the final decision maker was with regard to this incident
and whether that person knew when he made the decision that Keller had filed an EEOC charge.
Furthermore, Keller does not reference any similarly-situated employees who engaged in similar
behavior and were treated more favorably.  Thus, even if Plaintiffs had properly framed their
retaliation claim(s), and even if Keller's treatment amounted to an adverse employment action,
Defendants would still be entitled to judgment as a matter of law because Plaintiffs have not
adduced any direct evidence of retaliation and gave failed to establish a *prima facie* case of
retaliation under the indirect method of proof.

who were required to respond to Code Greens (or were required to respond to a disproportionately high percentage of them), a sufficient factual dispute might exist that would defeat summary judgment.  However, Plaintiffs' briefing falls far short on this issue, given that they have provided no admissible evidence to suggest that, after February 22, 2007, (the filing date for the EEOC charge), their exposure to emergency situations/Code Greens was disproportionately high or more frequent than other Madison employees.  Having failed to demonstrate that they suffered a materially adverse injury or harm for the purposes of their Title VII retaliation claim, Plaintiffs ultimately cannot recover on this theory.

Even if the court were able to find that Plaintiffs suffered such a harm, Plaintiffs have adduced no admissible evidence that would tie any alleged harm suffered by them to their protected activity.  Plaintiffs clearly cannot succeed on their retaliation claims via the direct method of proof in the absence of any admissible evidence to establish that there was a "causal connection" between their protected activity and the alleged adverse employment action or harm.  Plaintiffs do not assert, never mind prove, that their supervisors had "actual knowledge" that they had engaged in protected activity. Therefore, Plaintiffs' only recourse is via the indirect method of proof, which also proves to be unavailing.  Plaintiffs must establish that they were treated less favorably than similarly situated employees who did not engage in protected activity.  But, as stated previously, Plaintiffs have not supplied any names of any LPNs who were similarly

situated to Gullion in all material respects, who did not engage in protected activity and were treated more favorably than he was.  Likewise, Plaintiffs have not provided any evidence that Keller was treated less favorably than any similarly situated PA 4s who did not engage in protected activity.[10]  Without such evidence, Plaintiffs cannot sustain their burden of demonstrating a *prima facie* case of retaliation.  Because Plaintiffs did not suffer an adverse employment action or other harm, and because Plaintiffs have failed to demonstrate that they were treated less favorably than similarly situated employees who did not engage in protected activity, Defendants' Motion for Summary Judgment on Plaintiffs' claims of retaliation under Title VII shall be **GRANTED**.

### D. Plaintiffs' Claim of Intentional Infliction of Emotional Distress

Under Indiana law, the elements of a claim of intentional infliction of emotional distress are: 1) extreme or outrageous conduct by the defendant; 2) which intentionally or recklessly; 3) causes; 4) severe emotional distress to another.  *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991).  These elements of proof for a claim of intentional infliction of emotional distress are rigorously applied.  *Id*.  The Indiana Court of Appeals, in *Bradley v. Hall*, explained the extent to which a defendant's conduct must be extreme to rise to the

---

[10]In fact, a substantial portion of Plaintiffs' argument centers on their claim all male employees were prohibited from wearing shorts and that all male employees were required to respond to Code Greens.  This argument runs counter to Plaintiffs' attempt to establish a *prima facie* case under Title VII:  if similarly situated men who did not engage in protected activity were also not allowed to wear shorts in the workplace and also were required to respond to Code Greens, then Plaintiffs cannot demonstrate that they were treated less favorably than those similarly situated males, and their *prima facie* case of retaliation fails.

level of intentional infliction of emotion distress, holding as follows:

> Indiana cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or by a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

*Bradley*, 720 N.E.2d 747, 752-53 (Ind. Ct. App. 1999) (quoting Restatement (Second) of Torts § 46, cmt. D).  "Intentional infliction of emotional distress is found where the conduct exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind."  *Lachenman v. Stice*, 838 N.E.2d 451, 457 (Ind. Ct. App. 2005).

In the case at bar, there is simply nothing "outrageous" in terms of the nature of Plaintiffs' allegations against Defendants.  Many American employees are prohibited from wearing shorts to work; similarly, we assume that most are not permitted to play cards while on duty.  While Plaintiffs may have preferred to use their own electronic appliances at work, such as coffee makers, being prohibited from doing so does not rise to the level of a restriction that "goes beyond all possible bounds of decency."  Even if Plaintiffs were able to show that they were required to respond to Code Greens

emergencies more frequently than other Madison employees, such a requirement does not

rise to the level that most people would regard as outrageous.  Indeed, the need to respond

to unruly, sometimes even violent, patients must be seen as an expected part of the job of

staff members working at a mental institution.  Plaintiffs' allegations fall far short of

being outrageous conduct.  Thus Defendants' Motion for Summary Judgment shall also

be GRANTED as to Plaintiffs' intentional infliction of emotional distress claims.

## V.        Conclusion

For all the reasons explained above, Plaintiffs' Motion to Amend/Substitute

Response is **GRANTED**.  Defendants' Motion to Strike Affidavit of Randy Wilkerson is

**GRANTED in part**, to wit, the inadmissible portions of the affidavit are hereby stricken

and have been omitted from consideration in ruling on the Defendants' motion for

summary judgment.  Plaintiffs' Motion to File Surreply is **DENIED**.

For the additional reasons outlined above, the Court concludes that Plaintiffs have

failed to demonstrate a *prima facie* case of discrimination against them based on their

gender (male).  Plaintiffs have failed to adduce evidence from which a jury could find a

"hostile work environment."  Plaintiffs have also failed to demonstrate, either by direct

evidence or a *prima facie* showing, that they suffered retaliation.  Finally, Plaintiffs

cannot, on the evidence cited here, prevail on their claim of intentional infliction of

emotion distress.  Defendants' Motions for Summary Judgment is **GRANTED**, and all of

Plaintiffs' claims shall be **DISMISSED**.


**IT IS SO ORDERED.**



**Dated:**   07/22/2009


_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana




**Electronic copies to:**

Laura Lee Bowker
OFFICE OF THE INDIANA ATTORNEY GENERAL
laura.bowker@atg.in.gov

Samuel George Hayward
ADAMS HAYWARD & WELSH
samuelghayward@hotmail.com